[L. A. No. 11875. In Bank.—December 15, 1930.]

ARTHUR ANDERSON MITCHELL (an Incompetent), etc., Respondent, v. ETHEL WILLIAMS DUNN et al., Appellants.

Nat A. Rosenstein and Emmet A. Tompkins for Appellants.

Iva J. Angier, *in pro. per.,* for Respondent.

WASTE, C. J.—This action was brought by the present guardian of Arthur Anderson Mitchell, an incompetent, for the purpose of impressing a trust on certain specific real property now in the possession of defendants, on the theory that the same had been purchased by the defendants with funds belonging to the plaintiff during a period of time when the defendant Ethel Williams Dunn was the duly appointed and acting guardian of the incompetent plaintiff.

The facts leading up to the controversy are as follows: Defendant Ethel Williams Dunn is a sister of the incompetent, who, while in the service of the United States during the World War, was charged, together with other negro soldiers, with a criminal assault. He was adjudged insane, and was sent to an asylum in Chester, Illinois. Later, through the efforts of the defendant sister, he was transferred to an asylum in southern California. On October 2, 1919, defendant was appointed guardian of the estate and

person of her brother, and acted as such until October 14, 1927.

During the period that defendant acted as guardian, considerable money came into her possession belonging to the incompetent, such sums being derived from war risk insurance and government compensation. During a considerable portion of this time defendant had two accounts with the Citizens National Bank of Los Angeles, one a personal account and one a guardianship account. It appears, however, that she made no attempt to keep her personal and trust funds separate. On November 3, 1924, she purchased the real property which is the subject of this litigation, paying therefor, it is admitted, with a $3,900 check drawn on the guardianship account. The property was recorded by defendant in her own name, and immediately homesteaded. This property will be referred to as the Jefferson Street property. Plaintiff contends that the $3,900 was trust money; defendant contends it was her personal money. In order to fully understand the contentions of the parties, the origin of the money in the guardianship account must be traced.

From the time of her appointment as guardian, in 1919, until December, 1924, defendant had rendered no accounting of her trust. On December 10, 1924, her first account was approved by the court, it being found as of that date that defendant was in possession of $5,452.98 belonging to the estate of plaintiff. Most of this money had come into her possession before November 3, 1924, the date on which the Jefferson Street property was purchased, so that it can be safely said that on that date defendant should have had in her possession over $5,000 of trust funds. The two bank accounts, introduced in evidence, disclose that early in June, 1924, only $2 was on deposit to the guardianship account and slightly over $500 in the personal account of defendant, sums far less than the amount then supposedly in her possession belonging to plaintiff. No evidence was introduced by either party in reference to what had happened to the trust funds, but the inference is clear that the trust funds had been dissipated by defendant. On August 8, 1924, defendant deposited in the guardianship account the sum of $9,200, making a balance as of that date of $9,302

in that account. The origin of this $9,200 was traced by defendant as follows: In 1920 defendant had purchased a piece of real property in her own name, which will hereafter be referred to as the Kohler Street property. Defendant testified, and no reason appears for doubting the fact, that the down payment on this property was made from her own funds, being $1415 she had received as an allotment from the government on behalf of her husband, a soldier with the United States army in France. For a period of years defendant made payments on this Kohler Street property. Whether trust funds were used for this purpose is not clear, defendant testifying that the payments were made from her earnings and from rents received from the Kohler Street property, an apartment house. Plaintiff offered no evidence on this point. In June, 1924, defendant sold the Kohler Street property for cash, receiving $9,267 net on the deal. This money she first deposited in her personal account, and, on August 8, 1924, withdrew the same from that account and deposited $9,200 in the guardianship account and purchased the Jefferson Street property, which is involved in this suit. As set forth *supra,* on December 10, 1924, defendant should have had $5,452.98 belonging to the estate of plaintiff. On that date there was exactly $5,452.98 on deposit in the guardianship account.

Defendant continued to act as guardian until October of 1927, and during that period evidently dissipated the entire remainder of the fund. On October 14, 1927, upon petition of the regional attorney of the United States Veterans' Bureau, defendant was removed as guardian for mismanagement of the estate and Iva J. Angier was substituted in her place. On the final accounting, the court found that defendant should have in her possession $4,742.17 belonging to the estate of her brother. No part of this sum has ever been turned over to the present guardian. Upon this state of facts, defendant contends that the Jefferson Street property was purchased with personal funds, while plaintiff, with equal vigor, contends that the property was purchased with trust funds. The trial court found that the $3,967 (the exact amount paid for the Jefferson Street property) was trust money, and not the personal money of defendant, and decreed that the plaintiff was the

equitable owner of the Jefferson Street property; that defendant holds the legal title in trust for plaintiff; that the homestead declared thereon was null and void, and that defendant should deed the property to plaintiff.

On this appeal defendant-appellant contends that the evidence above summarized clearly shows that the entire $9,200 deposited in the trust account was money belonging to her separate estate, and that, therefore, the $3,900 drawn therefrom for the purchase of the Jefferson Street property was from her separate estate, and not from the trust estate. Appellant also contends that even if the $9,200 be treated as composed of both separate and trust funds, the particular $3,900 must be considered as separate money, for the reason that after withdrawing the same there still remained in the guardianship account an amount equal to the sum held in trust. In this connection, appellant strongly relies on the presumption that where a trustee commingles trust and personal funds, and then withdraws part of the fund, it will be presumed that the withdrawals were from the personal funds of the trustee, and that the balance constitutes the trust funds, citing such cases as *Elizalde* v. *Elizalde,* 137 Cal. 634, 641 [66 Pac. 369, 70 Pac. 861], and *People* v. *California Safe Deposit etc. Co.,* 175 Cal. 756, 760 [L. R. A. 1918A, 1151, 167 Pac. 388].

The contention of appellant that the evidence shows that she bought the Jefferson Street property with her separate funds is entirely without merit. It appears that before the $9,200 was deposited in the trust account the appellant had entirely dissipated the trust estate. When she withdrew the money from her personal account and deposited it in the guardianship account, she undoubtedly did so with the intent of replacing the trust funds that she had dissipated. It is true that appellant testified that the transfer was made to prevent her then husband from making claim thereon, but in such cases the trial court is not bound by the testimony of the trustee when the circumstances are such as to cast suspicion thereon. After making the deposit above mentioned, appellant clearly treated the guardianship account as composed of trust funds. In the accounting of December 10, 1924, the court allowed $200 attorney's fees and an $800 fee to the guardian. On December 10, 1924, $200

was withdrawn from the guardianship account, and on December 11th, $800 was withdrawn, undoubtedly to pay the above two items. This clearly shows an intent on the part of appellant to treat the funds deposited by her from her personal account as replacements of the trust funds, and is entirely incompatible with the idea that at all times she intended to treat the fund so transferred as belonging to her personal estate. ■ Moreover, when a trust fund has been partially dissipated by the trustee, and later the trustee deposits in the depleted account personal funds, there is a strong presumption that it was the trustee's intention in making such deposits to make the trust fund whole. (*Garst* v. *Canfield*, 44 R. I. 220 [116 Atl. 482].)

From the above reasoning, it follows that the guardianship account, containing, as it did, over $9,300, must be deemed to have been composed of about $5,400 trust moneys and about $3,900 personal moneys, when, on November 3, 1924, $3,900 was withdrawn therefrom to purchase the property in dispute. ■ The only question left to determine was whether the sum withdrawn was from the trust funds or from the personal funds of appellant. If the presumption that withdrawals must be deemed to have been from the personal part of the commingled fund applies to such a case, it is clear that no trust can be enforced against the Jefferson Street property.

We are of the opinion that the presumption mentioned has no application to a case such as this. The presumption is nothing more than a fiction created to assist the *cestui*, not to injure him. It was created to assist *cestuis* in following the trust property, not to hinder them. The basis of the presumption is that it will be presumed that a trustee acts honestly, and not dishonestly. In *People* v. *California Safe Deposit etc. Co., supra*, at page 760, the presumption is explained as follows: "The argument is based upon the well-settled rule that if a trustee mingles his own funds with the trust fund, and thereafter draws from time to time, from the commingled mass, 'it will be presumed that the moneys so drawn were from his own portion of the fund, rather than from the moneys held by him in trust' (citing several cases). Various expressions have been used in defining the nature of the rule. In some of the cases, as pointed

out by the appellant, it has been said that equity will 'attribute' the withdrawals to the trustee's private account. In others, as in the Elizalde case above cited, it is said that the trustee will be 'presumed' to have drawn his own money. In one case (*Crawford County Commissioners* v. *Strawn,* 157 Fed. 49 [15 L. R. A. (N. S.) 1100, 84 C. C. A. 553]), . . . the doctrine is explained as resting upon a 'fiction.' But whatever name is given to it, the rule originates in and rests upon the underlying presumption 'that a person is innocent of crime or wrong'."

In the case just quoted from, the trust arose by virtue of the trustee acquiring money of the plaintiff by fraud. The court held the presumption above mentioned had no application to such a case, because the trustee, having acted fraudulently in acquiring the money, cannot thereafter be presumed to have been acting honestly and rightfully. The same reasoning applies to the present case. The appellant herein wrongfully dissipated the trust funds in her possession and then replaced the funds wrongfully taken. Then, after purchasing the real property herein involved, appellant dissipated the entire fund. Can appellant, after having been guilty of such conduct over a period of years, come before the court and contend that, because it must be presumed she acted rightfully on November 3, 1924, the only tangible property purchased from the fund and still remaining in her possession must be presumed to have been purchased with personal funds, and that all the money that was dissipated by her must be presumed to have been trust funds? To state the proposition is to refute it. In fact, if we are to presume the appellant acted rightfully, it would be far more consonant with such a presumption to say that the property purchased was purchased with trust funds, and the money dissipated was personal funds. At any rate, the presumption in reference to withdrawals, in a contest between the *cestui* and trustee, based as it is, on a theory of right-doing, cannot be indulged in to defeat the *cestui's* right of recovery when all the evidence shows a consistent course of conduct amounting to wrong-doing. To permit the presumption to be used for that purpose would be to permit its use as a shield for wrong-doing, and that we are not inclined to do. The Supreme Court of Tennessee, in *Ameri-*

*can Surety Co.* v. *Grace,* 151 Tenn. 575 [271 S. W. 739, at page 742], after stating the presumption under consideration, had the following to say about its application: " . . . the rule stated is but a fiction of the law. It was invented to aid in the pursuit and recovery of a trust fund. It would destroy the whole purpose of this fiction if it were employed to obstruct a beneficiary seeking to follow a trust fund, and to protect an unfaithful trustee. . . . " The reasoning of that case appeals to us as applicable here. We are aware of the rule that a *cestui* cannot follow trust funds unless he can trace them into the specific property involved. ▮ It does not suffice merely to show possession of trust funds by the trustee and the purchase of the property—it *is* clear that the identity of the funds must be traced. (*Estate of Arms,* 186 Cal. 554 [199 Pac. 1053]; *Woodside* v. *Hewel,* 109 Cal. 481 [42 Pac. 152].) However, the degree of identification in an action between the *cestui* and the trustee is far less than in a case where the trustee is insolvent and the rights of creditors are involved. Whatever confusion may have existed in this regard in the decisions of this state was entirely set at rest by the case of *Noble* v. *Noble,* 198 Cal. 129 [43 A. L. R. 1235, 234 Pac. 439]. That case held that in a contest between the *cestui* and the administrator of a deceased defaulting trustee, where the trustee had commingled trust and personal funds, the *cestui* had a special lien on the entire estate of the deceased solvent trustee, even though the trust funds could not be traced into any definite property. The court very carefully distinguished the cases involving the rights of creditors, and held that a different rule applied in such cases. ▮ The rule is now settled in this state that when the money of the trustor can be traced into a particular fund, or deposit, though it be mingled with other money, the beneficiary may enforce the trust. (*Newport* v. *Hatton,* 195 Cal. 132, 150 [231 Pac. 987].)

▮ In the case at bar, the plaintiff has sufficiently traced the trust funds. The specific piece of property involved was purchased with money taken from a fund containing *trust* moneys. All other moneys were dissipated. The law will not permit the trustee to say that the only permanent investment made with moneys from the fund was with personal funds, and that the dissipated funds belonged to the

*cestui.* Under such circumstances it must be held that the property was purchased with trust funds, and that defendant holds the title in trust for plaintiff.

The judgment appealed from is affirmed.

Richards, J., Shenk, J., Seawell, J., Curtis, J., Preston, J., and Langdon, J., concurred.